UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
AUCTUS FUND, LLC,             )
                              )
              Plaintiff,      )
                              )
         v.                   )    CIVIL ACTION
                              )    NO. 21-11193-WGY
DRONE GUARDER, INC., and      )
ADAM TAYLOR,                  )
                              )
              Defendants.     )
_____)
```

YOUNG, D.J.                                    March 8, 2023

**FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT**

## I. INTRODUCTION

This case involves the enforceability of contracts pursuant to two loans.  Drone Guarder, Inc. ("Drone") and Auctus Fund, LLC ("Auctus"), executed two transactions as part of Auctus's investment in Drone.  When Drone continuously failed to pay on the loans, Auctus filed suit.  After a one-day bench trial held on November 3, 2022, this Court files these Findings of Fact and Rulings of Law.

## II. PROCEDURAL BACKGROUND

As part of the two transactions Drone and Auctus executed, Drone received from Auctus loans of $165,000 and $125,000 with a rate of 12% per annum.  Compl., Ex. 2, Convertible Promissory

1

Note, ("January Note"), at 1, ECF No. 1-2; Compl., Ex. 4, Convertible Promissory Note, ("May Note"), at 1, ECF No. 1-4.

On July 23, 2021, Auctus filed suit against Drone and Adam Taylor, the Chairman, Chief Executive Officer, and Chief Financial Officer of Drone, alleging that Drone failed to pay back the loans, accumulated interest, and fees.  Compl. ¶¶ 21-22, ECF No. 1.  The complaint alleges seven counts: breach of contract (count I); breach of the implied covenant of good faith and fair dealing (count II); unjust enrichment (count III); breach of fiduciary duty (count IV); fraud and deceit (count V); negligent misrepresentation (count VI); and violations of the Massachusetts Unfair Trade Practices, Mass. Gen. Laws ch. 93A, §§ 2, 11, (count VII). Id. ¶¶ 35-68.

Drone filed an answer to the complaint on October 25, 2021. Answer, ECF No. 12.  On January 20, 2022, the Court dismissed the fraud claim (count V) as withdrawn.  Elec. Clerk's Notes (January 20, 2022) ECF No. 28.

The Court held a bench trial on November 3, 2022.  Elec. Clerk's Notes (November 3, 2022) ECF No. 40.  The Court made findings of fact ore tenus, Trial Tr. at 48:14-25, but reserved the right to enter more detailed findings, as it now does, in conjunction with the following rulings of law.

## III. FINDINGS OF FACT

### A. The Agreements

Drone and Auctus entered into two transactions, as part of Auctus's investment in Drone.  Each transaction contained a Securities Purchase Agreement and Promissory Note.  Compl., Ex. 1, Securities Purchase Agreement ("January Purchase Agreement") at 1-27, ECF No. 1-1; Compl., Ex. 3, Securities Purchase Agreement ("May Purchase Agreement") at 1-27, ECF No. 1-3; January Note at 1-25; May Note at 1-25.  Both Securities Purchase Agreements and both Convertible Promissory Notes contain essentially the same relevant terms, except different principal amounts and dates.  Compare January Purchase Agreement 1-27, with May Purchase Agreement 1-27; and compare January Note 1-25, with May Note 1-25.

The first transaction took place on January 22, 2018. Drone and Auctus entered into a Securities Purchase Agreement where Auctus agreed to issue a "12% convertible note" in an aggregate principal amount of $165,000.00.  January Purchase Agreement at 2.  Drone and Auctus executed the Promissory Note on the same date.  January Note at 2.  The interest rate of the January Note was set at 12% per annum, which began accruing on the day the parties executed the January Note.  Id.

On May 10, 2018, Drone and Auctus executed the second transaction.  May Purchase Agreement at 1-27.  The parties

3

entered into a Securities Purchase Agreement where Auctus agreed to issue a "12% convertible note" in an aggregate principal amount of $125,000.00.  May Purchase Agreement at 2.  Drone and Auctus executed the Promissory Note on the same day.  May Note at 2.  The interest rate on the May Note was set at 12% per annum, which began accruing on the date of execution.  May Note at 2.

Adam Taylor, who was the Chairman, Chief Executive Officer, and Chief Financial Officer of Drone, and Lou Posner, Managing Director of Auctus, signed the January and May Purchase Agreements.  January Purchase Agreement at 27; May Purchase Agreement at 27.  Adam Taylor signed the January and May Notes, agreeing to the terms set therein.  January Note at 25; May Note at 25.

**B. Drone's Failure to Pay**

Drone was required to pay the principal amount and any accumulated interest on the "Maturity Date" of the note. January Note, at 2; May Note at 2.  The Maturity Date for the January Note was October 22, 2018, January Note at 2, and February 10, 2019, for the May Note, May Note, at 2.[1]  Drone

---

[1] The May Promissory Note and the conversion sheet for the May Note incorrectly state the "Maturity Date" as February 10, **2018**.  It seems, however, that both parties agree the Maturity Date was February 10, **2019**.  Compl. ¶ 22; Answer ¶22. Additionally, it defies logic for a promissory note issued in May to have a Maturity Date of four months prior to issuance.

failed to pay the full principal amount and interest due for either the January or May Notes.  Pl.'s Req. Findings of Fact and Rulings of L. ¶¶ 4, 6, at 2, ECF No. 38.  In relevant part, the January and May Notes state:

> Any amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of the lesser of (i) twenty four percent (24%) per annum or (ii) the maximum amount allowed by law from the due date thereof until the same is paid ("Default Interest").

May Note at 2; January Note at 2.  On October 22, 2018, the Maturity Date of the January Note, the 24% default interest rate began accruing on the January Note.  Trial Tr. at 27:2-6.  In contrast to the January note, Auctus never enforced a 24% interest rate on the May Note.  DRNG Note 2 Conversion Spreadsheet 1, Ex. 5.  Instead, the May Note accrued 12% interest from May 10, 2018, forward.  Id.

On May 30, 2019, Auctus notified Drone regarding Drone's default on the Notes and demanded payment of the principal, accumulated interests, penalties, and other fees on both the January and May Notes.  See Pl.'s Req. Findings of Facts and Rulings of L., ¶ 7, at 2, ECF No. 38.

**C. Conversion**

The terms of the January and May Notes allow Auctus to convert portions of the unpaid loan into fully paid and non-accessible shares of common stock of Drone.  January Note at 3;

May Note at 3.  Auctus could convert the Notes at any time after the issue date until the Maturity Date or date of payment of default amount.  Id.  Moreover, Auctus could convert the outstanding balance at a discount rate of 30%, or 70% if the loan was in default, of the market price of the stock.  Id.

The May Note was never converted.  DRNG Note 2, Conversion Spreadsheet 1, Ex. 5.

Kevin Singh, who has been a Financial Operations Analyst for Auctus since March 10, 2020, testified as a witness for Auctus regarding four different conversion sheets used to convert the January and May Notes.  Trial Tr. at 7:11-40:25. Analysts enter data from the promissory note into the conversion sheet, including the principal, interest rate, and dates.  Trial Tr. at 11:19-12:7.  Only the promissory note and any payments on the note are taken into account on the conversion sheet.  Trial Tr. at 12:15-13:1.  The conversion sheets are used to track the balance and accumulated interest of a note and convert principal due into shares of stock.  Trial Tr. at 37:6-18.

Auctus converted the January Note 16 times, DRNG Note 1, Conversion Spreadsheet 17, Ex. 7, resulting in an aggregate amount of $108,822 of the January Note being converted into

stock.[2]  Auctus charged a $500 "conversion fee" each time the
note was converted.  January Note at 4.  Any portion of the
principal, accrued and unpaid interest, or conversion fee could
be converted into shares of stock.  Id.

### 1. Conversion One of the May Note

Singh testified that the conversion sheet for the May Note
shows that the May Note was never converted into stock.  Trial
Tr. at 15:11-23.  Singh additionally testified to the interest
rate calculations on the conversion sheet, which uses the daily
interest rate for a certain number of days.  Trial Tr. at 16:5-
18.  The conversion sheet for the May Note states a "Daily
Default Interest" of $41.10 per diem, for 1,626 days, between
May 10, 2018, the day the note was issued, and October 27, 2022,
the date the conversion sheet was last used for the May Note.
DRNG Note 2, Conversion Spreadsheet 1, Ex. 5.  The Daily Default
Interest of the May Note provided for a "Total Default Interest"
of $66,828.60 and a "Total Outstanding Balance" of $191,828.60.
Id.  In sum, Auctus has never converted the May Note, and has
only been enforcing a 12% interest rate.

---

[2] Pl.'s Req. Findings of Fact and Rulings of Law, ¶ 8, at 2,
states that Auctus converted "a portion of the January Note and
May Note for an aggregate amount of $108,822."  Singh testified,
and Exhibit 5 shows, however, that the May Note was never
converted into stock.

## 2. Conversion Sixteen of the January Note

The January Note has seventeen conversion spreadsheets, two of which have been provided to the Court.  DRNG Note 1, Conversion Spreadsheet 16, Ex. 6; DRNG Note 1, Conversion Spreadsheet 17, Ex. 7.  Singh testified to both conversion sheets for the January Note, the first of which was the conversion 16 sheet.  Trial Tr. at 21:4-26:10; DRNG Note 1 Conversion Spreadsheet 16, Ex. 6.

The conversion 16 sheet for the January Note shows that, between May 13, 2021, and June 3, 2021, Auctus was enforcing a 24% interest rate on the January Note at $99.12/day.  DRNG Note 1, Conversion Spreadsheet 16, Ex. 6.  The conversion 16 sheet first calculates the total accumulated interest of the Note. Trial Tr. at 22:2-22:18.  Then, the conversion 16 sheet factors in the conversion price –- the amount being deducted from the principal in exchange for shares of stock. Trial Tr. at 22:11-23:18.  The conversion 16 sheet shows that Auctus deducted $4,130.1 from the $44,151.67 in default interest in exchange for shares of stock.  Id.  The remaining $39,521.57 in default interest is carried over to the conversion 17 sheet, Exhibit 7.

## 3. Conversion Seventeen of the January Note

Singh next testified to the conversion 17 sheet for the January Note.  Trial Tr. at 24:11-26:11.  DRNG Note 1, Conversion Spreadsheet 17, Ex. 7.  Conversion 17 took place on

October 27, 2022, 511 days after conversion 16.  DRNG Note 1,
Conversion Spreadsheet 17, Ex. 7.  The Conversion 17 sheet shows
that Auctus only enforced a 12% interest rate on the note
beginning on June 3, 2021.  Trial Tr. at 26:24-27:6.  Auctus did
not convert the January Note principal into shares of stock on
the Conversion 17 sheet. Id. Therefore, there are no deductions
on from the principal or accumulated default interest.  DRNG
Note 1 Conversion Spreadsheet 17, Ex. 7.

Up until conversion 16, on June 3, 2021, Auctus was
enforcing a 24% interest rate on the January Note.  Trial Tr. at
26:24-27:6.  The next conversion sheet, and the only conversion
sheet completed subsequent to the filing of this lawsuit,
enforced only a 12% interest rate and did not convert any of the
January Note into shares of stock.  DRNG Note 1, Conversion
Spreadsheet 17, Ex. 7.

Lastly, Auctus submitted a second conversion 17 sheet,
Exhibit 8, which Singh testified to having a 12% interest rate.
Trial Tr. at 27:13-24.  Singh stated that Exhibit 8 was prepared
to show the Court the total balance, had Auctus enforced only a
12% interest rate on the January Note and factored in all of the
conversions.  Id.

Further factual findings will be set out as necessary to
understand the legal analysis.

## IV. RULINGS OF LAW

The Court engages in a four-step analysis to assess whether and to what extent Drone owes damages to Auctus for failing to pay on the loans.  First, the  Court must determine the law that governs each contract.  Second, the Court considers the evidence admitted and arguments presented at trial to determine which claims in the complaint Auctus has proven.  Third, the Court considers the enforceability of the contract in light of the governing law.  Lastly, the court calculates the damages Drone owes to Auctus, if any.

### A. Jurisdiction

As a preliminary matter, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are citizens of different states and the amount in controversy exceeds $75,000. The subject matter jurisdiction of this Court is exhaustively explored in Auctus Fund, LLC v. Drone Guarder, Inc., 588 F. Supp. 3d 177, 180-190 (D. Mass. 2022).

### B. Choice of Law

First, the Court rules that Massachusetts law governs the enforcement of the January and May Notes.  Both Notes state that the Note "shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws."  January Note, at 21; May Note, at 21.

Despite these choice-of-law provisions, Nevada law does not govern the enforcement of the Notes.

"Since the Court sits in Massachusetts, it applies Massachusetts's choice of law approach to determine the law governing Auctus['s] . . . damages." Auctus Fund, LLC v. Sunstock, Inc., 405 F.Supp.3d 218, 226 (D. Mass. 2019) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 494, 496, (1941)).

Prior to the choice-of-law analysis, the Court "consider[s] whether the choice between the laws of the involved jurisdictions will affect the legal result." Id. (quoting Lou v. Otis Elevator Co., 77 Mass. App. Ct. 571, 584, 933 N.E.2d 140 (2010)). Here, the Court recognizes a true conflict exists between Nevada, which does not allow corporations to raise usury defenses, and Massachusetts, which allows corporations to void usurious loans under certain circumstances. Id. at 226-227; compare Nev. Rev. Stat. § 99.050, with Mass. Gen. Laws ch. 271, § 49.

Where, like here, the contracting parties "have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy." Id. at 227 (quoting Oxford Glob. Res., LLC v. Hernandez, 480 Mass. 462, 468 (2018)). Massachusetts courts decide whether to enforce a choice of law

11

agreement using "the two-tiered analysis set forth in the
Restatement (Second) of Conflict of Laws § 187(2)(1971) [the
'Restatement']." Id. (quoting Hodas v. Morin, 442 Mass. 544,
549–50, 814 N.E.2d 320 (2004)).  The Restatement presumes that
the parties' choice of law applies unless:

> a) the chosen state has no substantial relationship to
> the parties or the transaction and there is no other
> reasonable basis for the parties' choice, or
> (b) application of the law of the chosen state would be
> contrary to a fundamental policy of a state which has a
> materially greater interest than the chosen state in
> the determination of the particular issue and which,
> under the rule of § 188, would be the state of the
> applicable law in the absence of an effective choice of
> law by the parties.

Restatement § 187(2).  Here, Drone is headquartered in Nevada,
making Nevada law a reasonable choice under the Restatement
analysis.  See Order & Memorandum of Decision, ECF No. 31; see
also Compl. ¶¶ 4-5.  Auctus, however, brought suit to enforce
the contracts under Massachusetts law, Mass. Gen. Laws ch. 93A
§§ 2 and 11, and never addressed the choice-of-law provision in
the complaint or other filings.  In briefs and supporting
documents submitted to the court, both parties implied that
Massachusetts law governs enforcement of the Notes and Purchase
Agreements.  Since neither party has indicated an intention to
enforce or defend enforcement of the Notes under Nevada law, the
choice-of-law provision has been waived and would be
unreasonable to enforce.  See Schiavone Constr. Co. v. Time,

Inc., 735 F.2d 94, 96 (3rd Cir. 1984); see also Abate v. Wal-Mart Stores East, L.P., 503 F.Supp.3d 257, n.1 (D.Pa. 2020) (determining that the parties implicitly agreed that the choice-of-law provision had been waived because neither party had mentioned or intended to enforce it); SJ Abstract v. Old Republic Nat'l Title Ins. Co., 2021 U.S. Dist. LEXIS 197925, 2021 WL 4847803, n.2 (D.Pa. 2021) (stating that because "neither party mentions the Agreement's choice-of-law provision or cites Minnesota law in its brief, this Court finds that the provision has been waived."). Where "the parties agree on the substantive law that should govern," the Court "may hold the parties to their plausible choice of law." Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 23 (1st Cir. 2011)(quoting Perry v. Blum, 629 F.3d 1, 8 (1st Cir. 2010)). Since the parties do not dispute that Massachusetts law governs enforcement of the Notes, "the Court need not engage in a choice of law analysis." Schiavone, 735 F.2d at 96.

Therefore, the Court rules that Massachusetts law governs the enforcement of the January and May Notes.

**C. Auctus's Claims Against Drone**

Drone is liable for breaching its contracts with Auctus. The remainder of the claims against Drone fail for lack of the requisite proof and judgment shall enter for Drone as to each of those claims.

First, Auctus alleges that Drone breached the contracts it had with Auctus (count I).  Compl. ¶¶ 35-41.  To succeed on a breach-of-contract claim, Auctus must prove that: (1) "the parties reached a valid and binding agreement . . ." (2) Drone "breached the terms of . . . the agreement;" and (3) Auctus "suffered damages from the breach."  Linton v. New York Life Ins. and Annuity Corp., 392 F. Supp. 2d 39, 41 (D. Mass. 2005) (Zobel, J.).  Auctus has proven all three elements. The parties agree that on January 22, 2018, and again on May 10, 2018, Auctus and Drone executed Securities Purchase Agreements and Promissory Notes, thereby entering into a contract.  Compl. ¶¶ 10-11; Answer ¶¶ 10-11.  Drone had a duty to pay the principal, interest, and fees to which it agreed in these contracts.  Drone failed to pay either the January or May Notes on the Maturity Date.  Pl.'s Req. Findings of Facts and Rulings of Law, ¶¶ 4, 6, at 2, ECF No. 38.  Therefore, this Court holds that Drone was in breach of the January Purchase Agreement and Note when it failed to pay Auctus on October 22, 2018, and was in breach of the May Purchase Agreement and Note when it failed to pay Auctus on February 10, 2019.

Auctus alleges in count II that Drone breached the implied covenant of good faith and fair dealing.  Compl. ¶¶ 42-49. Although "every contract implies good faith and fair dealing between the parties to it," Auctus has not proven that Drone

breached this covenant.  Young v. Wells Fargo Bank, N.A., 717
F.3d 224, 237 (1st Cir. 2013) (quoting T.W. Nickerson, Inc. v.
Fleet Nat'l Bank, 456 Mass. 562, 924 N.E.2d 696, 703-04 (2010)).
The mere failure to perform a contract is not enough.  Auctus
need not show that Drone acted in bad faith but must present
evidence of an absence of good faith.  Id.  Auctus has proven
that Drone failed to pay on the Maturity Dates of the notes, in
breach of the contracts, but has not shown that this failure to
pay held a "dishonest purpose, conscious doing of wrong, or
breach of duty through motive of self-interest or ill will."
Id. at 238 (quoting Hartford Accident & Indem. Co. v. Millis
Roofing & Sheet Metal, Inc., 11 Mass.App.Ct. 998, 418 N.E.2d
645, 647 (1981)); see also id. (stating that the core question
is "whether the alleged conduct was motivated by a desire to
gain an unfair advantage, or otherwise had the effect of
injuring the other party's rights to the fruits of the
contract.").  Therefore, the Court finds for Drone on count II.

In count III, Auctus alleges unjust enrichment against
Drone.  Compl. ¶¶ 50-54.  Since the Court has determined that
Drone was in breach of its contracts with Auctus, the unjust
enrichment claim is dismissed with prejudice.  See Lass v. Bank
of America, 695 F.3d 129, 140 (1st Cir. 2012) ("damages for
breach of contract and unjust enrichment are mutually
exclusive"); see also Metropolitan Life Ins. Co. v. Cotter, 464

Mass. 623, 641, 984 N.E.2d 835 (2013) (discussing how "a claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties").

In count IV, Auctus alleges that Drone breached its fiduciary duty to Auctus. Compl. ¶¶ 55-58. To succeed on a claim of breach of fiduciary duty, Auctus must show that Drone owed it a fiduciary duty, and Auctus suffered an injury that was proximately caused by Drone's breach of fiduciary duty. See UBS Financial Services, Inc. v. Aliberti, 483 Mass. 396, 405 (2019). Here, Auctus has failed to prove a fiduciary relationship existed between it and Drone. Merely showing that the parties entered into a business transaction where Auctus placed its trust in Drone to abide by the agreement does not establish a fiduciary relationship. See Blais v. Warren Five Cents Sav. Bank, 1993 Mass. App. Div. 213, 2 (1993) (quoting Snow v. Merchs. Nat'l Bank, 309 Mass. 354, 360 (1941)). Nor does "[t]he relationship of a debtor and creditor, without more, establish a fiduciary relationship." Id. (quoting Shawmut Bank, N.A. v. Wayman, 34 Mass. App. Ct. 20, 24 (1993)). Judgment will enter for Drone on count IV, the breach of fiduciary duty claim.

In count VI, Auctus alleges that Drone's conduct constitutes negligent misrepresentation, to Auctus's detriment. Compl. ¶¶ 62-64. Judgment will enter for Drone on count VI as well. "Failure to perform a contractual duty does not give rise

16

to a tort claim for negligent misrepresentation." <u>Cumis</u>
<u>Insurance Society, Inc.</u> v. <u>BJ's Wholesale Club, Inc.</u>, 455 Mass.
458, 474 (2009); <u>see also</u> <u>Anderson</u> v. <u>Fox Hill Village</u>
<u>Homeowners Corp.</u>, 424 Mass. 365, 368, 676 N.E.2d 821 (1997).
Contractual obligations and statements promising performance on
the contract cannot constitute negligent misrepresentation
unless "the promisor had no intention to perform the promise at
the time it was made." <u>Cumis</u>, 455 Mass. at 474; <u>see also</u>
<u>Brewster Wallcovering Co.</u> v. <u>Blue Mountain Wallcoverings, Inc.</u>,
68 Mass.App.Ct. 582, 601 n. 45, 864 N.E.2d 518 (2007).  Auctus
has not proven that, at the times of the borrowing, Drone did
not intend to pay the January or May Notes.

Lastly, Auctus asserts claims under the Massachusetts
Unfair Trade Practices Act, Mass. Gen. Laws ch. 93A Sections 2
and 11, against Drone.  Compl. ¶¶ 65-68.  Section 2 and Section
11 prohibit any "unfair or deceptive acts or practices in the
conduct of any trade or commerce."  Mass Gen. Laws. ch. 93A §§
2, 11.  A breach of contract, without more, does not amount to a
violation of 93A.  <u>See</u> <u>Hoffman</u> v. <u>Thras.io Inc.</u>, 538 F.Supp.3d
196, 207 (D. Mass. 2021) (Saris, J.) (the plaintiff "must
demonstrate that Defendants' actions fell within at least the
penumbra of some common-law, statutory or other established
concept of unfairness," or "were otherwise immoral, unethical,
oppressive or unscrupulous" (quoting <u>Bowers</u> v. <u>Baystate Techs.</u>,

Inc., 101 F. Supp. 2d 53, 54-55 (D. Mass. 2000)(Gorton, J.))
(internal quotations omitted)).  Auctus failed to prove that
Drone engaged in any unfair or deceptive acts prohibited by
Mass. Gen. Laws. ch. 93A, Sections 2 and 11.  Accordingly,
judgment will enter for Drone on count VII, the Massachusetts
Consumer Protection Act claim.

### D. Auctus's Claims Against Adam Taylor

In addition to asserting claims against Drone, Auctus
asserted claims against Adam Taylor, Chairman, Chief Executive
Officer, and Chief Financial Officer of Drone. Compl. ¶ 1.  Even
assuming Adam Taylor was a guarantor, as alleged in the
complaint, id. ¶¶ 37, 45; considering that Taylor was absent at
trial and Auctus offered no evidence of Taylor's liability,
judgment will enter for Adam Taylor on all of Auctus' claims.

### E. Drone's Defense that the Loans are Usurious

Courts in this District have frowned on Auctus' business
model as violating the Massachusetts' policy against usury.  See
e.g., Auctus Fund, LLC v. Sunstock, Inc., 405 F. Supp. 3d 218,
230 (D. Mass. 2019); Auctus Fund, LLC v. Nano Mobile Healthcare,
Inc., No. 1:17-CV-11974-ADB, 2019 WL 13234361, at *1 (D. Mass.
Jan. 30, 2019)(Burroughs, J.).  So long as such loans are
registered with the Office of the Massachusetts Attorney
General, however, usurious loans such as those provided by
Auctus here are permissible, Mass. Gen. Laws ch. 271 § 49 (d), -

18

- a provision this Court has termed a glaring deficiency in Massachusetts law.  See Kaur v. World Bus. Lenders, LLC, 440 F. Supp. 3d 111, 122 (D. Mass. 2020).  Here Auctus, for some reason, failed so to register.  Trial Tr. at 46:24-47:11.  Thus, these loans, while not void, are voidable.

The Court analyzes these points seriatim:

### 1. The Notes Violate the Massachusetts Usury Act

The loan contracts between Auctus and Drone, that Drone subsequently breached, contain usurious provisions in violation of the Massachusetts Usury Act, Mass. Gen. Laws ch. 271 § 49(a). The January and May Notes violate the Massachusetts Usury Act because the default interest rate is set higher than the statutory maximum and the conversion tool likewise has the potential to exceed the statutory maximum.

The Massachusetts Usury Act prohibits contracting for "interest and expenses the aggregate of which exceeds . . . twenty per centum per annum" of the loan.  Mass. Gen. Laws. ch. 271 § 49(a).  Default interest rates are included within this prohibition, regardless whether the usurious rate could have been avoided by timely paying the loans.  See In re Rolfe, 25 B.R. 89 (Bankr. D. Mass. 1982) aff'd, 710 F.2d 1 (1st Cir. 1983).

Both the January and May Notes contain a 24% default interest rate -- above the statutory maximum established by the

Massachusetts Usury Act.  Mass. Gen. Laws. ch. 271 § 49(a).  The
January Note enforced the 24% default interest rate between
October 22, 2018, and June 3, 2021.  Trial Tr. at 26:24-27:6.
Auctus sought to enforce the May Note that defaulted on February
10, 2019, only at the originally contracted interest rate of
12%.  See Note 1, conversion 1 sheet, Ex. 5.  Even though Auctus
never enforced the 24% default interest rate on the May Note,
the Note violates the Massachusetts Usury Act because it
contains a usurious provision.  See In re Loucheschi LLC, 471
B.R. 777, 782 (Bankr. D. Mass. 2012) (determining that a loan
with a default interest rate in excess of 20% is in violation of
Section 49(a), regardless whether the default interest rate was
actually enforced).  Therefore, the 24% default interest rate in
both the January and May Notes is in violation of the
Massachusetts Usury Act.

Additionally, the conversion rights in the January and May
Notes violate the Massachusetts Usury Act.  The Notes allow
Auctus to convert an amount of the outstanding balance to stock
at any point after issuance of the loans at a discount rate of
30%, or 70% if the loan is in default, of the market price of
the stock.  January Note at 4; May Note at 4; Trial Tr. at
38:17-39:17.  The difference between the market value of the
stock that Auctus trades and the amount Auctus actually pays for
the stock has a very high potential to exceed 20% of the

principal amount of the loan per year.  For example, Auctus, over the course of a year, could convert $30,000 of outstanding balance on the January Note to $100,000 worth of stock at market value.  That $70,000 loss incurred by Drone would be an "expense the aggregate of which exceeds twenty [percent]" of the $150,749.65 principal on the January Note.  Mass. Gen. Laws ch. 271 § 49(a).

Had Auctus registered with the Massachusetts Attorney General's office, the default interest rate and conversion discount would have been permissible.  Id. § 49(d).  Auctus neglected to do so.  Trial Tr. at 46:24-47:11.  Therefore, because the January and May Notes impose interest and expenses in excess of 20% of the principal of the loan, the January and May Notes violate the Massachusetts Usury Act, Mass. Gen. Laws ch. 271 § 49(a).

### 2. The Notes Violate the Massachusetts Unfair Trade Practices Statute

Additionally, the January and May Notes violate the Massachusetts Unfair Trade Practices Act because a violation of the Massachusetts Usury Act is per se a violation of Mass. Gen. Laws. ch. 93A Section 2.  See Feloni v. Coco, No. 16-12178-GAO, 2019 WL 2387761, at *20 (D. Mass. 2019) (Bowler, M.J.) ("as a public policy statute, covered by the Code of Massachusetts Regulations, a violation of the Massachusetts usury statute

constitutes a per se violation of Chapter 93A." (quoting In re
Pena, 397 B.R. 566, 577 (B.A.P. 1st Cir. 2008))).

### 3. Remedy

Upon finding that a contract violates the Massachusetts
Usury Act by charging an interest rate above 20%, the Court can
void the entire loan, reform it, or construct other remedies
"consistent with equitable principles." Germinara v. People's
Comprehensive Mortg., LLC, 98 Mass. App. Ct. 1117, at *3 (2020);
see also Beach Associates, Inc. v. Fauser, 9 Mass. App. Ct. 386,
343 (1980); see also In re Tavares, 298 B.R. 195 (Bankr. D.
Mass. 2003).  To weigh the equities, the court balances a
"number of factors including the importance of the public policy
against usury, whether a refusal to enforce the term will
further that policy, the gravity of the misconduct involved, the
materiality of the provision to the rest of the contract, and
the impact of the remedy on the parties' rights and duties."
Germinara, 98 Mass. App. Ct. at *3 (quoting Begelfer v.
Najarian, 381 Mass. 177, 189 (1980)).

Here, equitable principles do not call for the Court to
void the entire loan.  Cf. Id.; see also Beach Associates, 9
Mass. App. Ct. at 343.  Drone has provided no evidence that  it
was misled, coerced, under duress, or other misconduct to
support voiding the entire loan.  Id.  As both parties are
sophisticated, the agreements are presumptively reasonable.  See

<u>Labrys Fund, L.P.</u> v. <u>Anvia Holdings Corporation</u>, No. 19-12477-PBS, 2020 WL 1984227, *3-5 (D. Mass. 2020) (Saris, J.). Although Drone asserts that it "was in terrible financial straits" and "without a quick infusion of capital, it faced certain death," Drone does not dispute that it understood its obligations under the agreements at the time the agreements were made.  Trial Tr. at 43:10-43:13.  Additionally, the Notes provide for an alternative default interest rate in the event that the 24% default interest rate is forbidden by law.  January Note at 1; May Note at 1.  In light of these findings, declaring the entire loan void would not be an equitable solution.  <u>See</u> <u>Germinara</u>, 98 Mass.App.Ct. at *3.

It is far, far better to **reform** the two loan contracts, so Auctus may, at a minimum, recover the money it has loaned in good faith, but stripping out Auctus' usurious conditions, sanctioning Auctus for its unfair trade practices, and awarding Drone reasonable attorneys' fees for Auctus' misconduct.

## IV. CONCLUSION

Accordingly, the Court **orders**:

1. As to count I, Auctus shall reconvey to Drone any Drone stock it owns pursuant to the conversions, repay to Drone any conversion fees, and the loan balances shall be reset to those extant prior to any conversions less any penalties or additional charges.

2. The loan contracts themselves shall be reformed to simple term loans for the re-set loan balances to run for the duration of the original loan at 12% per annum, which loan term shall commence 30 days from the date of the entry of judgment herein.  These loan contracts shall be free of any right to accelerate or to recover penalties upon default or attorneys' fees. Any attempt by Auctus to modify these terms absent court order shall be deemed a violation of the Unfair Trade Practices Act, see Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474, 821 (1991), which shall render that loan contract void and unenforceable.

3. Drone may submit, within 30 days of the date of this order, a claim for reasonable attorneys' fees for defending this action.

24

4. Count III is dismissed as duplicative.  Judgment

   shall enter for Drone on all the remaining counts and

   for Adam Taylor on all counts.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[3]

---

[3] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 45 years.